UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC SEAWRIGHT,<br>Plaintiff,<br>v.<br>ANDREA R. LUCAS,<br>Defendant. | Case No. 26-cv-03444-TSH<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 26 |

## I. INTRODUCTION

Plaintiff Marc Seawright served as the Director of Information Governance and Strategy at the U.S. Equal Employment Opportunity Commission (EEOC) until he resigned on June 18, 2025. He brings three claims under Title VII of the Civil Rights Act of 1964 against the EEOC's Chair, Defendant Andrea Lucas, in her official capacity: hostile work environment, discrimination, and retaliation, each culminating in an alleged constructive discharge. Defendant moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, to strike allegations under Rule 12(f). ECF No. 26. Plaintiff filed an Opposition (ECF No. 28) and Defendant filed a Reply (ECF No. 29). The Court finds this matter suitable for disposition without oral argument and **VACATES** the October 8, 2026 hearing. *See* Civ. L.R. 7-1(b). For the reasons stated below, the Court **DENIES** the motion.[1]

## II. BACKGROUND

The Court takes the complaint's well-pleaded factual allegations as true for purposes of this motion.

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 10, 22.

United States District Court
Northern District of California

Plaintiff is a queer transgender man. Compl. ¶ 1, ECF No. 1. From 2017 to 2025, he served as a senior employee of the EEOC, including most recently as Director of Information Governance and Strategy. *Id.* ¶¶ 1-2.

On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. 90 Fed. Reg. 8615. The Executive Order states: "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. Defining "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa," the Executive Order directed federal agencies to remove all internal and external statements or messages that "inculcate gender ideology" and prohibited the use of federal funds to "promote gender ideology." *Id.* §§ 2(e)-(g).

After issuance of the Executive Order, the EEOC, led by then-Acting Chair Andrea Lucas, "engaged in a series of actions targeting transgender Agency employees, including removing existing mechanisms to prevent gender identity harassment; rescinding longstanding anti-discrimination policies protecting LGBTQ+ employees; and disbanding the EEOC's internal LGBTQ+ employee resource group." Compl. ¶ 6. These actions included removing all mentions of LGBTQ+ people and their rights from the EEOC's outreach and training materials, which Plaintiff was required to carry out, *id*. ¶¶ 49–51, 54; disbanding EEOC Pride, the LGBTQ+ employee resource group which Plaintiff was an elected leader of, *id*. ¶ 60–63, dismantling the Self-Service User Profile App (the App) that Plaintiff developed and implemented, *id*. ¶¶ 55–57; withdrawing from active litigation on behalf of transgender employees, *id*. ¶ 68; directing Agency employees not to process charges brought by people alleging discrimination based on gender identity, *id*. ¶¶ 64, 67; removing the "Mx." option from EEOC systems and replacing the term "gender identity" with "transgender status," *id*. ¶¶ 76–78; and revoking the EEOC's internal "Non-Discrimination and Inclusion Policy Regarding Gender Identity and Sexual Orientation," which had been in place since 2009, *id*. ¶ 74. Although changes to the EEOC's data classification systems were ordinarily decisions in which Plaintiff would be involved, he was sidelined from all decision-making relating to the change from "gender identity" to "transgender status" and removal

of the "Mx." honorific. *Id.* ¶¶ 76–78.

On January 28, 2025, Defendant issued a press release declaring that "Sex is binary (male and female) and immutable. It is not harassment to acknowledge these truths-or to use language like pronouns that flow from these realities, even repeatedly." *Id.* ¶ 12.[2] Plaintiff alleges these actions made him feel that his existence and identity had been invalidated. *Id.* ¶ 50. "Being forced to build the tool that carried out the Agency's erasure of transgender employees like himself took a profound toll on Mr. Seawright's mental health, leading to feelings of personal loss, anxiety, stress, depression, and hopelessness." *Id.* ¶ 54. The removal of the App was personally distressing for him and caused him to fear he would be misgendered as he had been in the past at the EEOC. *Id.* ¶ 59. He lost a "critical support network" when EEOC Pride was ordered disbanded. *Id.* ¶ 62. The EEOC's withdrawal from litigation on behalf of transgender employees and actions to block the processing of complaints by transgender employees "communicated to Mr. Seawright that the EEOC no longer deemed him and other transgender and nonbinary people worthy of or entitled to legal protection in the workplace." *Id.* ¶ 69. Defendant's January 28 press release caused Plaintiff immediate emotional distress, fear for his safety at work, fear that he would be misgendered, and fear that his employer would no longer take his concerns about gender identity discrimination seriously. *Id.* ¶ 72. Plaintiff's mental anguish and physical sickness increased such that he had to take personal leave from February 3 to 26, 2025. *Id.* ¶ 75.

On March 3, 2025, Plaintiff tried to file an Equal Employment Opportunity complaint but was initially unable to do so because the filing instructions no longer listed gender identity discrimination as a basis for filing a complaint. *Id.* ¶ 79. On March 4 he submitted a report through EEOC's internal reporting process alleging he experienced discrimination and harassment based on sex, specifically gender identity and sexual orientation. *Id.* ¶ 80. After Plaintiff discussed his concerns with his direct supervisor and others and indicated his intent to pursue a formal complaint, Keesela Reis, Director of National Engagement and Field Management

---

[2] Press Release, *Removing Gender Ideology and Restoring the EEOC's Role of Protecting Women in the Workplace*, U.S. Equal Employment Opportunity Commission (Jan. 28, 2025), https://www.eeoc.gov/newsroom/removing-gender-ideology-and-restoring-eeocs-roleprotecting-women-workplace.

Programs, said he had "fallen out of favor with" the Office of Field Programs. *Id.* ¶¶ 51, 81. On March 18 Plaintiff submitted an Equal Employment Opportunity complaint describing the discrimination and harassment that he had experienced. *Id.* ¶ 82. His complaint also outlined his belief that the Agency violated its statutory obligation to process Title VII complaints by refusing to process and investigate charges of gender identity discrimination based on the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020). *Id.* ¶ 83.

After Plaintiff submitted his complaints, he was subjected to increasing marginalization, hostility, and exclusion. *Id.* ¶¶ 84–90. On June 11, 2025, after Plaintiff told Jamie Williamson, Director of the Philadelphia District Office, that he no longer felt comfortable working at the EEOC because the workplace had become hostile to transgender people, Ms. Williamson responded that "it is very hostile. There is no doubt about it." *Id.* ¶ 91.

On June 13, 2025, Plaintiff submitted a formal Equal Employment Opportunity complaint alleging harassment and discrimination based on sex. *Id.* ¶ 92. On June 18 Plaintiff sent an email to several Agency leaders, including Defendant, announcing that he was resigning from his position at the EEOC due to animus against transgender workers. *Id.* ¶¶ 93-94 & Ex. A.

On March 27, 2026, the EEOC issued its Final Agency Decision, finding no discrimination.[3] *Id.* ¶¶ 20, 28. Plaintiff timely filed this action on April 23, 2026. *See* 29 C.F.R. § 1614.310. He brings three claims: (1) Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.; (2) Discrimination in Violation of Title VII; and (3) Retaliation in Violation of Title VII.

Defendant moves to dismiss on four grounds. First, Defendant argues the Court lacks subject matter jurisdiction because Plaintiff's allegations concerning Executive Order 14168 and the agency's implementation of it are "generalized grievances" that do not confer standing, and that those allegations should alternatively be stricken under Rule 12(f). Mot. at 8-11. Second, Defendant argues Count I fails because Plaintiff alleges no verbal or physical conduct of a harassing nature directed at him, because the conduct alleged is not sufficiently severe or

[3] The Court takes judicial notice of the final agency decision as described below.

pervasive, and because Plaintiff does not allege the conduct was based on his protected characteristic. *Id.* at 12-17. Third, Defendant argues Count II fails because Plaintiff identifies no similarly situated comparator and pleads no direct or circumstantial evidence supporting an inference of discrimination. *Id.* at 17-20. Fourth, Defendant argues Count III fails because most of the challenged conduct predates Plaintiff's March 2025 protected activity and because the remaining incidents are neither materially adverse nor causally connected to it. *Id.* at 20-21. Defendant further argues that, absent an underlying violation, the constructive discharge allegations fail as a matter of law, and that Plaintiff's resignation letter reflects a values-based resignation. *Id.* at 21.

## III. JUDICIAL NOTICE

Plaintiff requests the Court take judicial notice of Executive Order 14168. Request for Judicial Notice, ECF No. 27-1. The Court **GRANTS** Plaintiff's request to take judicial notice under Federal Rule of Evidence 201. *See* 44 U.S.C. § 1505 (mandating that presidential proclamations and executive orders be published in the Federal Register); 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").

Defendant asks the Court to take judicial notice of the March 27, 2026 Final Agency Decision. Mot. at 4 n.1. The Court takes notice of the decision's existence and of what it states, but not of the truth of the facts or findings within it. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (courts "cannot take judicial notice of disputed facts contained in such public records."); *Ahmed v. Wormuth*, 2023 WL 4205765, at *4 (N.D. Cal. June 26, 2023) (taking judicial notice of EEOC final agency decision as a public record that related to plaintiff's allegations regarding his EEO complaints). Nor is the agency decision incorporated by reference. The complaint mentions it only to plead exhaustion, Compl. ¶¶ 20, 28, and "the mere mention of the existence of a document is insufficient." *Khoja*, 899 F.3d at 1002 (citation omitted). Further, even when a document is incorporated, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003. And the final agency decision's conclusions have no preclusive effect here, because federal employees are entitled to a trial de novo. *Chandler v. Roudebush*, 425 U.S. 840, 864



United States District Court
Northern District of California

United States District Court
Northern District of California

(1976).

## IV. LEGAL STANDARD

### A. Rule 12(b)(1)

Federal district courts are courts of limited jurisdiction: "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted). Accordingly, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citation omitted); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to move to dismiss a lawsuit for lack of subject matter jurisdiction. Lack of Article III standing is properly raised in a Rule 12(b)(1) motion. *Iten v. Los Angeles*, 81 F.4th 979, 985 (9th Cir. 2023). A jurisdictional challenge may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Defendant mounts a facial challenge. On such a challenge, the Court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Dismissal of a complaint without leave to amend should only be granted where the jurisdictional defect cannot be cured by amendment. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

### B. Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a claim. *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011). Rule 8 provides that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a party need not give "detailed factual allegations," they must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Hikma Pharm. v. Amarin. Pharma, Inc.*, 608 U.S 580, 589-90 (2026) ("[T]o nudge a claim across the line from conceivable to plausible, a plaintiff must plead facts that, if true, allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (cleaned up).

In considering a motion to dismiss under Rule 12(b)(6), courts accept the truth of all factual allegations and construe them in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citations and quotations omitted). A court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## V. DISCUSSION

### A. Article III Standing

Defendant argues Plaintiff lacks standing because: "Viewed as a whole, Plaintiff's allegations arise principally from Plaintiff's disagreement with the Agency's implementation of the Executive Order and the resulting Agency-wide policy decisions, not from any individual injury in fact suffered by Plaintiff." Mot. at 8. She maintains the complaint "does not principally target the coworkers and supervisors with whom Plaintiff worked for more than eight years — individuals who elevated Plaintiff to a director-level role in February 2025 amid said policy changes. Rather, the Complaint expresses grievance with the new Executive and administrative

priorities." *Id.* The Court disagrees.

**1. Legal Standard**

"Article III of the U.S. Constitution authorizes the judiciary to adjudicate only 'cases' and 'controversies.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018). "The doctrine of standing is 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)) (internal quotations omitted).

The injury-in-fact requirement mandates that a plaintiff show they "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 560) (cleaned up). Thus, to satisfy Article III, a plaintiff's injury must be "concrete—that is, real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (cleaned up). Simply put, "[n]o concrete harm, no standing." *Id.* at 417.

**2. Discussion**

Defendant argues this case should be dismissed for lack of standing, labelling Plaintiff's allegations as "unactionable generalized grievances," but this misconstrues the nature of his claims. Defendant argues "Title VII protects an employee from unlawful treatment of that employee; it does not provide a vehicle for an employee to obtain judicial review of every Agency policy the employee believes is inconsistent with Title VII or hostile to a protected group." Mot. at 10. However, Plaintiff's employment relationship with the Agency distinguishes his case from those relied upon by Defendant, all of which involved citizens or third-party groups challenging government policies. *See id.* at 7, 10-11 (citing *Lujan*, 504 U.S. 555 (environmental groups challenging rule promulgated by the Secretary of the Interior); *Warth*, 422 U.S. 490 (organizations and residents challenging city zoning ordinance); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398

(2013) (attorneys and human rights, labor, legal, and media organizations challenging federal statute); *FreeState Justice v. E.E.O.C.*, 2026 WL 1703707 (D. Md. June 12, 2026) (nonprofit organization challenging EEOC policy); *Cross v. U.S. Equal Emp. Opportunity Comm'n*, 810 F. Supp. 3d 88 (D.D.C. 2025) (private-sector charging party bringing APA challenge to EEOC memorandum directing closure of disparate-impact investigations)). Here, Plaintiff's allegations are not mere "disagreement[s] with the Agency's implementation of the Executive Order and the resulting Agency-wide policy decisions." *See* Opp'n at 8. Nor is Plaintiff challenging the "legality, constitutionality, or implementation of Executive Order 14168 or the Commission's policy decisions implementing that Order."[4] *See id.* at 9. Rather, Plaintiff alleges that, under a totality-of-the circumstances analysis, the Agency's implementation of the Executive Order and resulting Agency-wide policy decisions created a hostile work environment for *him* based on his sex.

Further, despite Defendant's labelling Plaintiff's allegations as "generalized grievances," the allegations in his complaint, when taken as true, provide examples of Agency actions that "affect[ed] [him] in a personal and individual way." *See Lujan*, 504 U.S. at 560 n.1. He alleges these actions took a profound toll on his mental and physical health. Compl. ¶¶ 49–63, 95. Plaintiff's mental anguish and physical sickness increased such that he had to take over three weeks of personal leave at one point. *Id.* ¶ 75. These allegations, as well as the alleged constructive discharge that arose from them, constitute injuries that are concrete, particularized, and actual, fairly traceable to Defendant, and redressable by a favorable court decision, thus conferring Article III standing. *See id.* ¶ 93; *Lujan*, 504 U.S. at 560; *Spokeo*, 578 U.S. at 339 n.7. Plaintiff's alleged injuries are no different from those in any other hostile work environment claim. Further, his discrimination and retaliation claims based on constructive discharge also

[4] The focus of Plaintiff's allegations relating to the EEOC's charge-processing decisions is not whether the Agency has discretion, but rather what impact those decisions had on him as a transgender employee. Thus, *FreeState*, in which a nonprofit organization sought a declaratory judgment that Executive Order 14168 is unlawful and unconstitutional, is inapposite. *See FreeState*, 2026 WL 1703707, at *4 ("While deeply troubling, the Court agrees with Defendants that the EEOC's decision to alter its investigations of gender identity discrimination claims constitutes a discretionary decision over which the Court lacks authority to review.").

allege economic losses. Compl. ¶¶ 104 ("As a direct and proximate result of Defendant's actions, Mr. Seawright suffered and continues to suffer damages in the form of lost wages and benefits."); 112 (same); 121 (same). *See TransUnion LLC*, 594 U.S. at 425 (monetary injury is a concrete injury in fact under Article III).

Finally, Plaintiff alleges the actions Defendant labels as "generalized grievances" affected him in a "personal and individual way." *Id.* ¶¶ 64-78; *see Lujan*, 504 U.S. at 560 n.1. He argues these actions communicated to him "Defendant's perspective that transgender people like himself are unworthy of equal respect and treatment, that transgender identity is a fraud, and that all mentions of transgender existence should be erased—thus contributing to a hostile work environment affecting Mr. Seawright in a personal and individual way." Opp'n at 8 (citing *Maldonado v. City of Altus*, 433 F.3d 1294, 1304–05 (10th Cir. 2006) (a policy "may create or contribute to the hostility of the work environment."); *Sharp v. S&S Activewear, LLC*, 69 F.4th 974, 977 (9th Cir. 2023) ("[H]arassment . . . need not be directly targeted at a particular plaintiff in order to pollute a workplace and give rise to a Title VII claim."). The fact that "an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 578 U.S. at 339 n.7.

In reply, Defendant argues *Warth* does not turn on the plaintiff's relationship to the defendant but on whether the alleged injury is "shared in substantially equal measure by all or a large class of citizens," and that the relevant class here is every EEOC employee. Reply at 2 (quoting *Warth*, 422 U.S. at 499). But Plaintiff does not allege merely that agency policy changed. He alleges he personally was directed to build the mechanism implementing those changes, Compl. ¶¶ 51–54; that an application he himself developed to prevent misgendering was dismantled, *id*. ¶¶ 55–59; that he had been misgendered by coworkers at the agency before these events, *id*. ¶ 59; that his distress required over three weeks of leave, *id*. ¶ 75; and that he resigned, forgoing wages and benefits, *id*. ¶¶ 93, 104. Those injuries are not shared in substantially equal measure by the agency's workforce. That some of them arose from conduct of general application does not make them general. *See Spokeo*, 578 U.S. at 339 n.7.

Defendant adds that this reasoning "collapses the standing inquiry into the merits inquiry."

United States District Court
Northern District of California

Reply at 3. The Court disagrees, as whether the conduct Plaintiff describes violates Title VII is a separate merits question, which the Court addresses below in the context of Defendant's 12(b)(6) motion. Whether Plaintiff himself was injured is the standing question, and it "in no way depends on the merits." *Maya*, 658 F.3d at 1068 (quoting *Warth*, 422 U.S. at 500). Defendant's authorities involved plaintiffs challenging government policy in the abstract, not an employee alleging that his employer's conduct altered his own working conditions. *See* Mot. at 16, 23. Accordingly, the Court **DENIES** Defendant's Rule 12(b)(1) motion.

**3. Motion to Strike**

In the alternative, Defendant argues Plaintiff's "generalized grievances allegations should be stricken from the Complaint pursuant to Rule 12(f)." Mot. at 11. Federal Rule of Civil Procedure 12(f) states that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are "regarded with disfavor because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice." *Z.A. ex rel. K.A. v. St. Helena Unified Sch. Dist.*, 2010 WL 370333, at *2 (N.D. Cal. Jan. 25, 2010). Motions to strike "should be denied unless the matter has no logical connection to the controversy at issue and may prejudice one or more of the parties to the suit." *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 511175, at *1 (N.D. Cal. Feb. 6, 2015).

Here, the Court finds Defendant is attempting to challenge the substantive sufficiency of Plaintiff's allegations. Use of a Rule 12(f) motion for this purpose is improper. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974–76 (9th Cir. 2010) ("Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law."). Defendant asks the Court to strike "those claims and allegations the EEOC already found to be 'generalized grievances.' ([Final Agency Decision] (d), (f), (g), (h), (i), (j), (k).)." Mot. at 11. First, as stated above, the Court has taken judicial notice of the agency decision's existence and of what it states, but not of the truth of the facts or findings within it. *See Khoja*, 899 F.3d at 999. As such, the Court cannot assume the truth of the decision "if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003. Second,

Plaintiff is entitled to a trial de novo, so the conclusions drawn in the final agency decision have no preclusive effect here. *See Chandler*, 425 U.S. at 864. Finally, the allegations Defendant characterizes as general grievances are directly relevant to whether Plaintiff's work environment was hostile under a totality-of-the-circumstances analysis. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Okonowsky v. Garland*, 109 F.4th 1166, 1179 (9th Cir. 2024); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–18 (2002) (because a hostile work environment claim is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" non-actionable component acts may be used as "background evidence" to support a timely claim). As such, the Court finds Defendant's request to strike the "generalized grievance" allegations is a merits argument improperly presented under Rule 12(f). The allegations are not immaterial because hostile environment claims "are based on the cumulative effect of individual acts," each of which "may not be actionable on its own." *Morgan*, 536 U.S. at 115; *see also Kovalenko v. Kirkland & Ellis LLP*, 2023 WL 5444728, at *4 (N.D. Cal. Aug. 23, 2023) (citing *Whittlestone*, 618 F.3d at 974–76, for the rule that using Rule 12(f) to challenge substantive sufficiency is improper).

Defendant's reply narrows this request considerably. Defendant now states: "To the extent any of these episodes are relevant only as context for the individualized allegations addressed below, Defendant does not object to their use as such." Reply at 4. That is the use the Court makes of them. What remains of the request fails for the reasons stated above.

The motion to strike is therefore **DENIED**.

**B. Count I: Hostile Work Environment**

In his hostile work environment claim, Plaintiff alleges he was subjected to harassment based on his gender identity, including repeated statements and actions by Defendant that denigrated his identity, condoned harassment against him, and denied him legal protections to which he is entitled. Compl. ¶ 100. He alleges Defendant's actions were sufficiently severe or pervasive to alter the conditions of his employment and create a hostile work environment, he perceived the working environment at the EEOC to be hostile based on his gender identity, a reasonable person who identifies as queer and transgender in his circumstances would consider the

working environment at the EEOC to be hostile, and, as a direct and proximate result of Defendant's actions, he suffered and continues to suffer damages in the form of lost wages and benefits and emotional distress. *Id.* ¶¶ 101-04. Defendant argues this claim fails because Plaintiff doesn't: (1) plausibly allege any actionable harassment; (2) allege conduct that is sufficiently severe or pervasive to alter the conditions of plaintiff's employment; and (3) allege facts showing that the at-issue acts were based on plaintiff's protected characteristic or prior protected activity. Mot. at 12-17.

**1. Legal Standard**

Because Plaintiff is a federal employee, Title VII's federal-sector provision applies and requires that "[a]ll personnel actions affecting employees or applicants for employment" in covered federal agencies "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The Ninth Circuit has treated the difference between the private and federal sector provisions as immaterial. *See Jordan v. Clark*, 847 F.2d 1368, 1373 n.3 (9th Cir. 1988). "This includes a prohibition against the creation of a hostile work environment." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 686 (9th Cir. 2017); *see also Harris*, 510 U.S. at 21 ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (cleaned up) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, (1986)). The Supreme Court has recognized that discrimination based on transgender status or sexual orientation is discrimination based on sex. *Bostock*, 590 U.S. at 669 ("[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex.")

"To establish sex discrimination under a hostile work environment theory, a plaintiff must show she was subjected to sex-based harassment that was sufficiently severe or pervasive to alter the conditions of employment, and that her employer is liable for this hostile work environment." *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020) (citations omitted). "The offensive conduct must be 'sufficiently severe or pervasive to alter the conditions of employment.'" *Sharp*, 69 F.4th at 978 (quoting *Christian*, 984 F.3d at 809). "Notably, individual targeting is not

required to establish a Title VII violation." *Id.* (citing *Reynaga*, 847 F.3d at 687). "'It is enough . . . if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.'" *Id.* (quoting *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994)). Objective hostility is judged "from the perspective of a reasonable person with the same fundamental characteristics." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). "This inquiry considers the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 22–23.

**2. Discussion**

**a. Sex-Based Harassment**

Harassment based on transgender identity is sex discrimination under Title VII because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. The Court finds Plaintiff's allegations regarding Defendant's denial of the legitimacy of transgender identity, condoning of misgendering, removal of the ability to identify pronouns and nonbinary honorifics in the EEOC's systems, and actions to erase the existence of transgender people from the EEOC's materials and block transgender complainants from obtaining the EEOC's services constitute conduct that is generally hostile toward transgender people. *See Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 172 (D. Md. 2022) (frequent misgendering contributed to hostile work environment for transgender plaintiff). Moreover, Plaintiff alleges he experienced these statements and actions as expressions of hostility. Compl. ¶¶ 49–50, 57, 63, 69, 70–72, 78, 86. "Whether these allegations will ultimately support a hostile work environment claim is a factual question properly answered at a later stage." *Kovalenko*, 2023 WL 5444728, at *8 (denying motion to dismiss hostile work environment claim based on sex where female plaintiff alleged defendants "consistently gave male associates preferential treatment at her own expense, such that her work life was unmanageable") (citing *Young v. Buttigieg*, 2021 WL 981305, at *11 (N.D. Cal. Mar. 16, 2021) (finding challenge to the severity and pervasiveness of the alleged conduct was

better evaluated on a full evidentiary record); *Haro v. Therm-X of California, Inc.*, 2015 WL 5121251, at *6 (N.D. Cal. Aug. 28, 2015) (finding defendant's arguments about "the severity or pervasiveness of the alleged harassment . . . are better addressed as questions of fact.")).

Defendant argues this claim fails at the threshold because Plaintiff does not allege "verbal or physical conduct of a harassing nature." Mot. at 12-13 (quoting *Kortan v. California Youth Authority*, 217 F.3d 1104, 1109–10 (9th Cir. 2000)). In Defendant's view, what Plaintiff describes are policy directives and administrative decisions, not harassment, and such conduct is categorically outside the inquiry. The Court disagrees for three reasons.

First, the Ninth Circuit's standard asks whether the plaintiff was subjected to verbal or physical conduct connected to a protected characteristic. *See Okonowsky*, 109 F.4th at 1178 (quoting *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th Cir. 2021)). It is a description of the kind of conduct Title VII reaches, not a filter that excludes communications because they take the form of a written directive rather than a spoken remark. Defendant's own authority puts the point in terms of tendency rather than limitation, observing that the element "*typically* involves physical touching or repeated comments and gestures based on a protected characteristic." Mot. at 12 (emphasis added) (quoting *Silveria v. McDonough*, 2022 WL 187839, at *1 (9th Cir. Jan. 20, 2022)). What is typical is not what is required.

Second, binding authority forecloses the categorical rule Defendant proposes. In *Okonowsky*, the Ninth Circuit held that a district court erred by excluding from the hostile work environment analysis conduct consisting entirely of written social media posts made away from the workplace, reasoning that "even if discriminatory or intimidating conduct occurs wholly offsite, it remains relevant to the extent it affects the employee's working environment." *Okonowsky*, 109 F.4th at 1181. If written communications from outside the workplace fall within the inquiry, written communications issued by the employer within the workplace cannot be categorically outside it. Similarly, in *Sharp*, the court held that music played throughout a warehouse, i.e., conduct that was neither addressed to the plaintiffs nor involving physical contact, could support a hostile work environment claim. 69 F.4th at 976-77. And the totality of the circumstances expressly includes "whether [the conduct] unreasonably interfere[d] with an

employee's work performance," a factor that contemplates conduct which is neither speech nor touching. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001).

Defendant's reply distinguishes *Sharp* on its facts, emphasizing that the music there was played continuously for approximately two years and was an inescapable condition of the physical workplace, while here Plaintiff alleges only "discrete communications and policy documents." Reply at 3-4. This point is relevant to the severity and pervasiveness of the conduct, but *Sharp* did not hold that only continuous and inescapable conduct may be considered; it held that targeting is not required. 69 F.4th at 978. And *Sharp* itself arose on a Rule 12(b)(6) motion: the Ninth Circuit vacated the dismissal and remanded for reconsideration of the pleadings' sufficiency. *Id*. at 977.

Third, Defendant's argument does not fit the complaint, as much of what Plaintiff alleges is verbal in the most ordinary sense. He alleges Defendant issued a public statement declaring that sex is "binary (male and female) and immutable" and that "[i]t is not harassment to acknowledge these truths-or to use language like pronouns that flow from these realities, even repeatedly." Compl. ¶¶ 12, 70. He alleges that a program director told him he had "fallen out of favor," *id*. ¶ 81; that a colleague questioned his authority by reference to "transition activities," *id*. ¶ 90; and that a district director agreed the agency had become "very hostile" to transgender employees, *id*. ¶ 91. That these statements were made during agency business does not remove them from the analysis. *See Christian*, 984 F.3d at 810 (otherwise innocuous conduct may take on a different character when viewed against a pattern of discriminatory harassment); *Kovalenko*, 2023 WL 5444728, at *8 (rejecting the argument that harassment allegations grounded in personnel management decisions cannot support a Title VII hostile work environment claim).

In her reply, Defendant agrees that *Christian* permits context to be considered, but she argues it does not permit a plaintiff "to import hostility from facially neutral, Agency-wide policy documents into unrelated personnel decisions absent any factual link between the two." Reply at 5. But here Plaintiff alleges the decisions from which he was excluded concerned the terminology used for transgender employees and the honorific available to nonbinary employees, Compl. ¶¶ 76–78, and the official alleged to have directed them is the same official alleged to have announced publicly that repeated misgendering is not harassment, *id*. ¶¶ 12, 70. Whether these

allegations survive at a later stage in this case is a different question.

The Court does not hold that every personnel decision an employee dislikes may be repackaged as harassment. Title VII is not a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), and an employer's ordinary administration of its workforce is not converted into harassment by a plaintiff's disagreement with it. But conduct is not excluded from the hostile work environment inquiry merely because it was communicated as a directive or implemented as a policy. Whether the conduct alleged here, viewed cumulatively, was severe or pervasive is addressed below.

Defendant also argues: "There is no allegation that any EEOC supervisor or employee 'ever made any derogatory comments relating to plaintiff's' identifying as transgender or queer." Mot. at 13 (quoting *Keller-McIntyre v. San Francisco State University*, 2007 WL 776126, at *13 (N.D. Cal. Mar. 12, 2007)). Again, Defendant's focus on individual targeting is misplaced. It does not matter if these statements and actions were directed toward transgender people generally or Plaintiff individually. *See Sharp*, 69 F.4th at 978. A statement that denigrates a protected group of which a plaintiff is part contributes to a hostile work environment for that plaintiff. *See Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1488–89 (9th Cir. 1993) (recognizing that a policy that denigrates a protected group can contribute to a hostile work environment, finding the rationale for a hostile work environment claim set forth in *Meritor* "applies equally to cases in which seemingly neutral policies of a company infuse the atmosphere of the workplace with discrimination."); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (en banc) ("The harasser need not close the circle with reference to the plaintiff specifically: 'and you are a "bitch," too.'") (quoting *Yuknis v. First Student, Inc.*, 481 F.3d 552, 553–54 (7th Cir. 2007) (comments need not be directed at a person to be discriminatory; comments addressed to the plaintiff's "target area"— her protected group—may constitute actionable harassment)). The operative question is not whether the plaintiff was personally targeted, it is whether the conduct "'pollutes the victim's workplace, making it more difficult for [the plaintiff] to do [their] job, to take pride in [their] work, and to desire to stay on in [their] position.'" *Sharp*, 69 F.4th at 978.

Nor must a plaintiff prove the defendant intended to create a hostile work environment.

*See Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991) ("[T]he reasonable victim standard we adopt today classifies conduct as unlawful sexual harassment even when harassers do not realize that their conduct creates a hostile working environment."); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc) ("[I]ntent to create a hostile work environment is not an element of a hostile environment claim."); *Maldonado*, 433 F.3d at 1304-05 (a rational juror could find that an English-only policy created a hostile work environment for Hispanic employees because, under some circumstances, a policy itself can reasonably be construed as an expression of hostility toward a protected group: "A policy requiring each employee to wear a badge noting his or her religion, for example, might well engender extreme discomfort in a reasonable employee who belongs to a minority religion, even if no co-worker utters a word on the matter."). What matters is how Defendant's actions affected Plaintiff's work environment. The policies at issue in this case — allegations regarding Defendant's denial of the legitimacy of transgender identity, condoning of misgendering, removal of the ability to identify pronouns and nonbinary honorifics in the EEOC's systems, and actions to erase the existence of transgender people from the EEOC's materials and block transgender complainants from obtaining the EEOC's services—affect transgender employees in a "unique and especially offensive way" and can reasonably be construed as expressions of anti-transgender hostility. *See Sharp*, 69 F.4th at 981 (vacating dismissal of a hostile work environment claim alleging that misogynistic music played throughout the workplace affected women uniquely).

Finally, Defendant argues Plaintiff alleges only "employment decisions with which Plaintiff disagreed, not physical or verbal conduct of a harassing nature," and that the conduct described is "the usual set of activities which occur between supervisors and employees." Mot. at 13. Defendant cites several district court cases for these propositions, but Defendant's reliance on those cases is unpersuasive. The Court first notes that all but one of these cases were decided on summary judgment, after discovery, on records the courts could weigh. *See Keller-McIntyre*, 2007 WL 776126, at *14; *Bleeker v. Johanns*, 2009 WL 4730931, at *8 (D. Ariz. Dec. 2, 2009), *aff'd sub nom.*, 468 F. App'x 731 (9th Cir. 2012); *Cooper v. Dignity Health*, 438 F. Supp. 3d 1002, 1016 (D. Ariz. 2020), *aff'd,* 2021 WL 3667225 (9th Cir. Aug. 18, 2021); *Pesci v.*

*McDonald*, 2015 WL 12672094, at *12 (C.D. Cal. Oct. 22, 2015); *Luat v. Mabus*, 2013 WL 12091018, at *12 (S.D. Cal. July 31, 2013). Unlike summary judgment, which focuses on a full record, the Court's focus at this stage is Plaintiff's allegations, which must be accepted as true. Decisions holding that a plaintiff failed to *substantiate* a harassing purpose say little about whether this Plaintiff has adequately *alleged* one. *See Kovalenko*, 2023 WL 5444728, at *8; *Young*, 2021 WL 981305, at *11; *Haro*, 2015 WL 5121251, at *6.

Defendant also relies on *Dixon v. Hawaii, Dep't of Educ.*, 2017 WL 6029589, at *10 (D. Haw. Dec. 5, 2017), a case decided at the motion for judgment on the pleadings stage, which is functionally identical to that governing a Rule 12(b)(6) motion. However, Defendant's reliance on *Dixon* is also unpersuasive. Defendant's parenthetical for *Dixon* reads: "allegations based on 'work-related actions by supervisors' acting within the scope of their official duties do not plausibly demonstrate an abusive work environment." Mot. at 13. But *Dixon* held only that the complaint there failed to plead severity or pervasiveness, with the court repeatedly faulting plaintiff's application for the absence of dates, frequency, and explanation of how the conduct altered working conditions. *Dixon*, 2017 WL 6029589 at *9–11. The language Defendant quotes appears in a subordinate observation ("This is particularly true where . . ."), *id.* at *11, not as a rule that supervisory acts are categorically outside the inquiry. But the proposition for which Defendant offers this case cannot be stated so broadly because the inquiry looks to "all the circumstances," *Harris*, 510 U.S. at 23, and rests on "the cumulative effect of individual acts," each of which "may not be actionable on its own," *Morgan*, 536 U.S. at 115. Conduct is "viewed cumulatively and contextually, rather than in isolation." *Sharp*, 69 F.4th at 978. And "what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character." *Christian*, 984 F.3d at 810. Defendant's framing would improperly require the Court to examine each directive in isolation and ask whether it was, standing alone, a routine supervisory act. *Dixon* is also factually distinguishable, as the conduct at issue (allegations that being assigned a small office space or different duties created an abusive working environment) were unrelated to the plaintiff's sex. *Id.* at *9. Here, the challenged conduct is defined by sex and gender identity.

The Court instead finds *Kovalenko* to be persuasive. There, defendants sought dismissal of a plaintiff's Title VII hostile work environment claim based on sex, arguing "Plaintiff's harassment allegations are all based on personnel management decisions that cannot form the basis of a harassment claim." *Kovalenko*, 2023 WL 5444728, at *8. The court rejected this argument, observing that the plaintiff had plausibly alleged an environment that made it "more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position," and holding that whether the allegations would ultimately sustain the claim was "a factual question properly answered at a later stage." *Id.* (quoting *Sharp*, 69 F.4th at 978). The same is true here, where Defendant asks the Court to dismiss Plaintiff's claim because the conduct described is "the usual set of activities which occur between supervisors and employees," Mot. at 13, yet Plaintiff has also alleged an environment that made it difficult for him to do his job and stay in his position. "At this stage, the Court cannot say as a matter of law that a reasonable [man] in Plaintiff's position 'would not consider the terms and conditions of [his] employment altered' by Defendants' conduct." *Kovalenko*, 2023 WL 5444728, at *8 (citing *Corrales v. Chase Bankcard Serv., Inc.*, 128 F. App'x 598, 599 (9th Cir. 2005)). As such, the Court finds Plaintiff has plausibly alleged that the work environment made it "more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position." *Sharp*, 69 F.4th at 978.

**b. Severe or Pervasive**

"In analyzing the objective hostility of a working environment, we must look to the totality of the circumstances surrounding the plaintiff's claim." *Okonowsky*, 109 F.4th at 1179 (citing *Clark Cnty. Sch. Dist.*, 532 U.S. at 270–71). "That includes assessing the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Id.* (cleaned up). "No single factor in this non-exhaustive list is required." *Id.* (cleaned up) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008)). "Courts also must consider that the required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct, and the cumulative effect of conduct over time." *Id.* (cleaned up) (citing *Clark Cnty. Sch. Dist.*, 532 U.S. at 270 ("Workplace conduct is not measured

in isolation.”).

Defendant argues Plaintiff's “individualized allegations fall well short” of the type of behavior that is considered severe and pervasive. Mot. at 14. However, Plaintiff alleges more than a list of individualized, unrelated allegations; he alleges that statements and actions hostile to transgender people pervaded his work environment. A workplace policy that affects daily working conditions is necessarily pervasive. *See Lopez v. Mountain View Care & Rehab. Ctr., LLC*, 2022 WL 202955, at *10 (M.D. Pa. Jan. 21, 2022) (“a policy which affects working conditions on a daily basis . . . shows pervasiveness.”). Plaintiff alleges his daily working conditions were adversely affected by the Agency's actions, as he was no longer protected by any EEOC policy from harassment, he no longer had an employee resource group for support, all traces of the existence of the protected groups he belongs to were removed from EEOC materials, he could not use the App to identify his pronouns in electronic communications, and it became unclear whether he was permitted to use the men's restroom at work. Compl. ¶¶ 17, 49-63, 75, 95. As such, the Court finds Plaintiff has plausibly alleged the EEOC's actions were pervasive. *See El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1074 (9th Cir. 2005) (supervisor's persistent use of a Westernized version of an employee's Arabic name (“Manny” instead of “Mamdouh”) weekly at staff meetings and at least twice monthly by e-mail for nearly a year was “frequent and consistent rather than isolated” and supported a finding of a hostile work environment). Further, Defendant's attempt to reduce the number of incidents the Court should consider by stripping them of their context contravenes the core principle that in a hostile work environment case, conduct must be evaluated in its context. *See Christian*, 984 F.3d at 810 (“‘[W]hat might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender.’”) (quoting *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998)). Plaintiff argues he was not simply “asked to assist with organizing document review,” Mot. at 14, “he was required to help expedite the erasure of all mentions of sexual orientation and gender identity from EEOC materials,” and “[h]is network permissions were revoked, he was excluded from an important meeting, and he was subjected to unprecedented

micromanagement after he filed an EEO complaint alleging a discriminatory and hostile work environment for transgender employees." Opp'n at 16. Taken in their full context, including the reversal of the EEOC's broader position on transgender rights under Title VII, each incident Plaintiff alleges is relevant to the hostile work environment analysis. *See O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001) ("[W]ork sabotage, exclusion, denial of support, and humiliation . . . can in context contribute to a hostile work environment."); *Lee v. Marriott Int'l, Inc.*, 2025 WL 2689263, at *11 (N.D. Cal. Sept. 21, 2025) (personnel decisions may contribute to a hostile work environment). As such, the Court finds Plaintiff has plausibly alleged pervasive harassment.

The Court need not decide at the pleading stage whether any single incident was independently severe. The governing standard is severe or pervasive, and the alleged conduct must be assessed cumulatively and in context. *See Okonowsky*, 109 F.4th at 1179. Plaintiff alleges a course of conduct spanning several months that included statements by the head of the Agency concerning transgender identity and repeated misgendering, directives removing gender-identity materials and protections, the dismantling of an LGBTQ+ employee group and pronoun-display application, work assignments requiring Plaintiff to implement some of those changes, and later exclusions from matters within his area of responsibility. Compl. ¶¶ 49–78, 81, 85, 87, 90–91. He further alleges that the conditions interfered with his work, caused physical and emotional symptoms requiring more than three weeks of leave, and contributed to his resignation. *Id*. ¶¶ 54, 59, 62, 69, 72, 75, 93–95. Taken as true and viewed together, these allegations plausibly describe pervasive sex-based hostility that altered Plaintiff's working environment. *See Christian*, 984 F.3d at 810 (conduct must be considered cumulatively and contextually); *Sharp*, 69 F.4th at 978 (individual targeting is not required).

Defendant cites three cases in support of her argument that "[t]he Ninth Circuit has repeatedly held that conduct considerably sharper than what Plaintiff alleges here does not clear [the] bar" for severe and pervasive harassment. Mot. at 20 (citing *Manatt v. Bank of Am., NA*, 339 F.3d 792 (9th Cir. 2003); *Kortan*, 217 F.3d at 1110–11; *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003)). But the conduct Plaintiff alleges is more severe and more pervasive

than that alleged in any of those cases. In *Manatt*, the plaintiff's hostile work environment claim rested on a handful of offensive comments by co-workers over a two-and-a-half year period, only some of which were directed at the plaintiff. 339 F.3d at 798–99 (coworkers mocking plaintiff's accent and mimicking a racial stereotype on a couple of occasions fell into the "simple teasing" and "offhand comments" category and was not actionable). In *Kortan*, the Ninth Circuit found the alleged conduct did not give rise to a hostile working environment because it "was concentrated on one occasion" and "occurred in the wake of a dispute." 217 F.3d at 1110-11. Finally, in *Vasquez*, the plaintiff alleged two racist statements made six months apart. 349 F.3d at 642–44. In contrast, Plaintiff alleges hostile statements made by the head of the Agency, and numerous acts communicating hostility toward transgender people directed by her over a six-month period.

Finally, the Court finds Plaintiff has plausibly alleged he subjectively experienced his work environment as hostile, and a reasonable person under the circumstances would have experienced it as hostile. Plaintiff argues he experienced Defendant's statements and actions "as escalating hostility toward transgender people which rendered his workplace hostile. He suffered significant mental anguish and physical symptoms, which required him to take time off and ultimately to resign." Opp'n at 17-18; *see also* Compl. ¶¶ 49–50, 57, 63, 69, 70–72, 78, 86. This perception is underscored by the statements of other employees, including that Plaintiff had "fallen out of favor" and the agency had become "very hostile" to transgender people. Compl. ¶¶ 81, 91. Further, Plaintiff plausibly alleges that his perception of Defendant's statements as being hostile to transgender people was reasonable considering studies showing that using incorrect pronouns negatively impacts transgender people's health. *Id*. ¶ 36. Finally, Plaintiff has plausibly alleged that his perception of the hostility motivating Defendant's statements and actions was objectively reasonable in light of the stated purpose of the Executive Order she committed to implement, as he reasonably perceived Defendant's statements and actions to be in service of the view that transgender people are a threat to women and to "the validity of the entire American system." Opp'n at 18 (citing Executive Order 14168 § 1).

In sum, the Court finds Plaintiff has plausibly alleged he was subjected to sex-based harassment that was sufficiently severe or pervasive to alter the conditions of employment, and

United States District Court
Northern District of California

that his employer is liable for this hostile work environment. The arguments in Defendant's motion may bear on the weight of his allegations, but they do not render the claim implausible. Accordingly, the Court **DENIES** Defendant's motion to dismiss Plaintiff's hostile work environment claim.

**C. Count II: Discrimination**

In his second cause of action for discrimination, Plaintiff alleges Defendant altered the terms and conditions of his employment by excluding him from meetings, reducing his responsibilities, and minimizing the scope and influence of his role, which had been a senior leadership role; Defendant treated cisgender employees more favorably than Plaintiff by including them in decision-making processes in the scope of their professional expertise and role at the Agency, while excluding Plaintiff; Defendant subjected Plaintiff to an adverse personnel action by intentionally creating working conditions so intolerable that a reasonable person in Plaintiff's position would feel compelled to resign. Compl. ¶¶ 108-10. Plaintiff alleges he was qualified for the position he held but, as a direct and proximate result of Defendant's actions, he suffered and continues to suffer damages in the form of lost wages and benefits and emotional distress. *Id.* ¶¶ 111-12.

Defendant argues Plaintiff's discrimination claim realleges the same conduct alleged in his hostile work environment claim "and adds only the conclusory assertion that Defendant 'altered the terms and conditions of Mr. Seawright's employment by excluding him from meetings, reducing his responsibilities, and minimizing the scope and influence of his role.'" Mot. at 18 (quoting Compl. ¶ 108). She maintains: "Stripped of its conclusions, the Complaint's specific factual content – a single excluded meeting, an unexplained podcast-removal instruction, a temporary and quickly-restored access lapse – does not plausibly allege a material change to the objective terms of Plaintiff's employment, let alone one connected to Plaintiff's protected status rather than to the ordinary vicissitudes of a reorganizing office." *Id.* "Nor does Plaintiff allege that similarly situated cisgender or non-LGBTQ+ colleagues were treated more favorably under comparable circumstances; Plaintiff's assertion that Defendant 'treated cisgender employees more favorably' (Compl. ¶ 109) is unsupported by any factual comparator and is exactly the kind of

conclusory allegation *Twombly* and *Iqbal* require courts to disregard." *Id.*

**1. Legal Standard**

To establish a prima facie case of discrimination, Plaintiff must show "'(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.'" *Hittle v. City of Stockton*, 101 F.4th 1000, 1011–12 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 759 (2025) (quoting *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004)). "A plaintiff may demonstrate an inference of discrimination through comparison to similarly situated individuals, *or* any other circumstances surrounding the adverse employment action that give rise to an inference of discrimination." *Id.* (cleaned up; emphasis in original) (quoting *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010)); *see also Ahmed*, 2023 WL 4205765, at *8 ("The fourth element—that the plaintiff was subjected to an adverse employment action because of his membership in a protected class—can be alleged either through direct evidence of discrimination, such as a supervisor's derogatory comment about his race or gender . . . or through circumstantial evidence, which may include allegations that similarly situated individuals outside the plaintiff's protected class were treated more favorably or that other circumstances surrounding the at-issue employment action give rise to an inference of discrimination.") (citing *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1050 (9th Cir. 2009); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105-06 (9th Cir. 2008); *Hawn*, 615 F.3d at 1156).

When a plaintiff pleads a plausible prima facie case, the complaint sufficiently states a claim. *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012). However, a plaintiff is not required to plead a prima facie case of discrimination to survive a motion to dismiss. *Id.*; *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) ("Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case. Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for

discrimination cases.”). “When a plaintiff does not plead a prima facie case, courts still look to the elements of the prima facie case ‘to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.’” *Ahmed*, 2023 WL 4205765, at *8 (quoting *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 796-97 (N.D. Cal. 2015)).

**2. Discussion**

Defendant argues Plaintiff fails to allege facts to support a plausible inference that he received differential treatment because of his protected characteristic. Mot. at 18. She argues the complaint does not include any direct evidence of discrimination, such as derogatory comments about Plaintiff identifying as transgender or queer, nor does it allege circumstantial evidence to support an inference of discrimination, such as that others were treated more favorably than Plaintiff with respect to the employment actions at issue. *Id.* at 19. “Instead, the Complaint alleges Plaintiff’s asserted protected characteristic, attacks the Executive Order and its mandated implementation at the Agency, and then asks the Court to infer that the EEOC discriminated against Plaintiff’s protected characteristic without alleging facts to support a discriminatory link between the protected characteristic and the employment actions.” *Id.* at 20. However, the question before the Court at this stage is only whether the complaint pleads facts making the claim plausible. *Iqbal*, 556 U.S. at 678.

Because Plaintiff is a federal employee, his discrimination claim arises under 42 U.S.C. § 2000e-16(a), which requires that federal “personnel actions” be made free from discrimination based on sex. The Supreme Court recently clarified the standard for an actionable adverse employment action in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). There, the Court explained that a plaintiff must simply allege “some harm” regarding the terms and conditions of her employment to support a disparate treatment claim. *Id.* at 350. The Ninth Circuit has not addressed whether *Muldrow*’s formulation applies unchanged to federal employees under § 2000e-16(a). It has, however, applied Title VII’s general adverse-action framework to federal-sector plaintiffs without imposing any separate threshold. *See Ray v. Henderson*, 217 F.3d 1234, 1240, 1242–43 (9th Cir. 2000) (postal employee proceeding “pursuant to 42 U.S.C. § 2000e-16”).

District courts that have considered the question have likewise declined to limit *Muldrow* to private-sector suits. *See Grays v. Noem*, 2025 WL 2643421, at *3-4 (D.D.C. Sept. 15, 2025) (rejecting the government's argument that a federal employee may proceed only on a "personnel action" as defined by the Civil Service Reform Act, 5 U.S.C. § 2302(a)(2)(A), whose residual category reaches unenumerated changes in duties, responsibilities, or working conditions only if they are "significant"); *Wilson v. Noem*, 2025 WL 1000666, at *22 (D.D.C. Apr. 3, 2025) (collecting cases). The Court also notes that Defendant does not argue that the textual difference between § 2000e-2(a)(1) and § 2000e-16(a) requires a different adverse action standard. The Court therefore applies *Muldrow* here. *See Babb v. Wilkie*, 589 U.S. 399, 405 (2020) (in construing the materially similar federal-sector ADEA provision, describing personnel actions as including decisions concerning work assignments and significant changes in duties or working conditions). The Court finds Plaintiff's allegations plausibly concern personnel actions affecting his duties and responsibilities.

First, Plaintiff alleges he is a queer, transgender man. Compl. ¶ 30. As discussed above, discrimination against a person for being transgender is discrimination because of sex. *Bostock*, 590 U.S. at 660. Defendant does not contend otherwise. Second, Plaintiff alleges he served the EEOC from 2017 until 2025, was promoted repeatedly, and that his work was "consistently praised and highly rated" until 2025. *Id.* ¶¶ 32, 93. Defendant does not argue that Plaintiff was unqualified.

As to the third element, Plaintiff alleges more than subjective disagreement with Agency policy. He alleges that matters ordinarily within his responsibility as Director of Information Governance and Strategy were decided without his participation; that he was excluded from a meeting with a technology contractor on an initiative he led; that a routine matter was escalated over him while a colleague questioned his role; and that his scope of responsibility and influence were reduced. Compl. ¶¶ 76–78, 87, 90, 93. Those allegations plausibly describe personnel actions affecting work assignments, duties, and responsibilities. They therefore are sufficient at the pleading stage whether evaluated under § 2000e-16(a)'s federal-sector "personnel actions" language or under *Muldrow*'s "some harm" standard.

Plaintiff also alleges constructive discharge. Compl. ¶ 110. Survival of the hostile-work-environment claim does not itself establish constructive discharge: the latter is an "aggravated case" requiring working conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146–47 (2004); *Green v. Brennan*, 578 U.S. 547, 555 (2016) ("The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'") (quoting *Pennsylvania State Police*, 542 U.S. at 141). Defendant argues Plaintiff's constructive discharge allegations fail because no underlying discrimination or hostile environment is pleaded, and she characterizes Plaintiff's resignation as values-based. Mot. at 21–22; Reply at 10–11. At this stage, however, Plaintiff alleges not only disagreement with Agency policy but escalating workplace conditions that personally affected him: he was required to implement some of the challenged changes; experienced physical and emotional symptoms requiring extended leave; was excluded from matters within his responsibilities; was told he had "fallen out of favor"; was told by another director that the workplace was "very hostile" to transgender people; and resigned days later while expressly attributing his departure to those conditions. Compl. ¶¶ 54, 75, 81, 87, 91, 93–95. Taken as true, those allegations are sufficient to make constructive discharge plausible, although whether the conditions were in fact intolerable is a question for a later stage.

Finally, as to the fourth element, an inference of discrimination may be supported either by more favorable treatment of similarly situated individuals or by other circumstances surrounding the challenged personnel actions. *Hittle*, 101 F.4th at 1011–12. Plaintiff pleads both. As to comparators, Plaintiff alleges that cisgender employees were treated more favorably. Compl. ¶ 109. In support, he alleges a specific instance that the application he built to display pronouns was disabled on the stated premise that pronoun display was unnecessary, a directive he alleges burdened transgender and nonbinary employees who, "unlike cisgender employees, face the daily fear of being misgendered." *Id.* ¶ 57.

The surrounding circumstances independently support the inference. Plaintiff alleges the

same official who made or directed the challenged decisions publicly stated that repeated misgendering is not harassment, *id.* ¶¶ 12, 70; rescinded the agency's gender-identity non-discrimination policy, *id.* ¶ 74; ordered the dismantling of the LGBTQ+ employee resource group Plaintiff helped lead, *id.* ¶¶ 60–63; and directed the removal of references to gender identity across agency materials, *id.* ¶¶ 49–54. Against that background, a factfinder could reasonably infer that Plaintiff's exclusion from decisions concerning precisely those subjects, including the terminology used for transgender employees and the honorific available to nonbinary employees, was not coincidental. Plaintiff further alleges he was told he had "fallen out of favor," *id.* ¶ 81, and that another director acknowledged the agency had become "very hostile" to transgender employees, *id.* ¶ 91.[5]

Defendant argues for the first time in her reply that the complaint "pleads the very opposite" of a diminished role because "Plaintiff was '*promoted* to Director of Information Governance and Strategy' in February 2025." Reply at 7 (emphasis in original; citing Compl. ¶ 32). However, a district court "need not consider arguments raised for the first time in a reply brief," *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Regardless, Defendant's argument does not change the result, as Plaintiff alleges the promotion occurred in February 2025, while the exclusions Plaintiff describes are alleged to have followed it, between February and June of that year. Compl. ¶¶ 76–78, 87, 90. An allegation that an employee was elevated and then stripped of the responsibilities the position carried is not self-refuting. If anything, the promotion supports Plaintiff's allegation that he was qualified for the role from which he says he was marginalized. *Id.* ¶ 111.

Accordingly, the Court finds Plaintiff adequately pleads discrimination and therefore **DENIES** Defendant's motion to dismiss this claim.

---

[5] Plaintiff states that, should the Court find his allegations insufficient, he is prepared to amend to include additional allegations, which he describes in his opposition. Opp'n at 20-21. The Court finds the additional allegations unnecessary at this stage, and, since they are not alleged in the complaint, the Court does not consider them here. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

**D. Retaliation**

In his third cause of action for retaliation, Plaintiff alleges he "complained to supervisors and other persons with authority, filed an internal report, and filed a formal EEO complaint, alleging that Defendant subjected him to harassment and discrimination based on his gender identity in violation of Title VII," and that in his charges he "also alleged that Defendant violated the EEOC's statutory obligation to process Title VII complaints by refusing to process and investigate charges of gender identity discrimination, as mandated by the Supreme Court in *Bostock*." Compl. ¶¶ 116-17. He alleges Defendant altered the terms and conditions his employment by "excluding him from meetings, reducing his responsibilities, and minimizing the scope and influence of his role, which had been a senior leadership role." *Id.* ¶ 118. Plaintiff alleges Defendant subjected him to an adverse action "by intentionally creating working conditions so intolerable . . . that a reasonable person in Mr. Seawright's position would feel compelled to resign." *Id.* ¶ 119. He further alleges these actions "would dissuade a reasonable employee from filing a complaint or otherwise opposing harassment and discrimination as Mr. Seawright did," and as a direct and proximate result of Defendant's actions, he "suffered and continues to suffer damages in the form of lost wages and benefits and emotional distress." *Id.* ¶ 121.

Defendant argues Plaintiff's retaliation claim fails because his "own timeline shows that most of the challenged Agency-wide policy conduct (i.e., the 'generalized grievances') predate Plaintiff's March 2025 internal report and complaint by weeks . . . and therefore cannot plausibly have been caused by that protected activity." Mot. at 21 (citing Compl. ¶¶ 49-82). Defendant further argues the complaint does not plead facts leading to the plausible conclusion that the at-issue employment actions were causally connected to his protected activity or that they were adverse as a matter of law. *Id.*

**1. Legal Standard**

Because Plaintiff was a federal employee, his retaliation claim proceeds through Title VII's federal-sector provision, 42 U.S.C. § 2000e-16(a). The Ninth Circuit has long held that § 2000e-16 incorporates Title VII's protection against retaliation for exercising statutory rights.

*Ayon v. Sampson*, 547 F.2d 446, 449–50 (9th Cir. 1976); *Ray*, 217 F.3d at 1240. To make out a prima facie case of retaliation, Plaintiff must show (1) protected activity, (2) a materially adverse action, and (3) a causal link between the two. *Surrell*, 518 F.3d at 1108.

**2. Discussion**

**a. Protected Activity**

An employee engages in a protected activity under Title VII where the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII, or where the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). In the latter case, "[i]t is unnecessary that the employment practice actually be unlawful; opposition thereto is protected when it is 'based on a *reasonable belief* that the employer has engaged in an unlawful employment practice." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) (quoting *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994) (emphasis in original, citations omitted)). Here, Plaintiff plausibly alleges he engaged in protected conduct when he filed internal complaints of discrimination and harassment with the EEOC on March 4 and March 18, 2025. Compl. ¶¶ 80–82.

**b. Adverse Employment Action**

"Title VII retaliation claims may be brought against a much broader range of employer conduct than substantive claims of discrimination." *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018). The plaintiff need only "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks and citation omitted). An action taken against a plaintiff may be "materially adverse" even if it did not result in a loss of compensation, job title, level of responsibility, or opportunity for promotion. *Id.* at 67 (rejecting the standard limiting actionable retaliation to "so-called 'ultimate employment decisions'").

Taking Plaintiff's allegations as true, the Court finds Plaintiff plausibly alleges retaliation. Plaintiff alleges that after he made an internal report on March 4, 2025 and spoke to his supervisor

about his intention to file an internal complaint, the following day, Ms. Reis told him he had "fallen out of favor" with her program. Compl. ¶ 81. One day later, on March 6, he learned he lost his network permissions, "making it impossible to conduct his work." *Id.* ¶ 85. Although his network permissions were eventually restored, a temporary action may still be materially adverse even if the employer later remedies it. *See Burlington Northern*, 548 U.S. at 72–73 (unpaid suspension not cured by later reinstatement). On May 15 EEOC officials excluded Plaintiff from a meeting with a technology contractor, despite his being the EEOC's Lead on this initiative. Compl. ¶ 87. According to Plaintiff, this "was no 'petty slight' or 'snub[]' but a significant exclusion from a meeting that was critical to Mr. Seawright's job success." Opp'n at 23 (brackets in original) (quoting *Burlington Northern*, 548 U.S. at 68). "Context matters" in retaliation cases. *Burlington Northern*, 548 U.S. at 69. As such, the impact of such workplace behavior must be evaluated from the perspective of a reasonable employee in the plaintiff's position, and it is plausible that Plaintiff would find it chilling to be suddenly excluded from a meeting about matters on which he was the Agency's lead. *See id.* ("A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."); *see also Ray*, 217 F.3d at 1243 (actions that decreased an employee's ability to influence workplace policy were adverse).

**c. Causal Link**

The Court also finds Plaintiff has plausibly alleged a causal link between his protected activity and the employment actions "by demonstrating that each action was implemented close on the heels of his complaints. That an employer's actions were caused by an employee's engagement in protected activities may be inferred from 'proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Ray*, 217 F.3d at 1244 (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). The gap in time was one or two days for two of the challenged actions, and a little over two months for the last. The Ninth Circuit has found such time gaps sufficient to support causation. *See Dawson v. Entek Int'l*, 630 F.3d 928,

937 (9th Cir. 2011) (two days); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) (two and a half months); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004) (three months).

Defendant argues for the first time in her reply that the complaint pleads no facts showing that the individuals who took these actions knew of Plaintiff's March 4 report, and that knowledge is a necessary component of causation. Reply at 9-10. Knowledge is part of the causal inference. *See Yartzoff*, 809 F.2d at 1376 (causation may be inferred from circumstantial evidence, "such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision"); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."). But the argument appears nowhere in the motion, and the Court therefore "need not consider arguments raised for the first time in a reply brief." *Zamani*, 491 F.3d at 997.

Even if the Court were to reach the argument, it would not support dismissal on this record. Plaintiff alleges the "fallen out of favor" remark came after he "discussed his concerns with his direct supervisor and others and indicated his intent to pursue a formal complaint." Compl. ¶¶ 51, 81. At the pleading stage, that sequence permits a reasonable inference that Plaintiff's concerns were known within the Office of Field Programs when the remark was made, and Plaintiff need not plead the internal communications that would establish it. Defendant may raise the issue on a developed record, where knowledge and causation are ordinarily resolved.

Accordingly, the Court finds Plaintiff has stated a plausible claim for retaliation.

## VI. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's motion to dismiss and strike. Defendant shall file her answer to Plaintiff's complaint by October 16, 2026.

The case management conference, currently scheduled for October 29, is **CONTINUED** to November 19, 2026 at 10:00 a.m. by Zoom video conference. The webinar link and instructions are located at https://cand.uscourts.gov/judges/hixson-thomas-s-tsh/. Lead trial counsel shall attend the conference. By November 12, 2026, the parties shall file a joint case management



United States District Court
Northern District of California

statement containing the information in the Standing Order for All Judges in the Northern District of California, available at https://cand.uscourts.gov/judges/hixson-thomas-s-tsh/. The Joint Case Management Statement form is available at http://cand.uscourts.gov/civilforms.

**IT IS SO ORDERED.**

Dated: October 2, 2026

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California